**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **THE WIREMOLD COMPANY** | : | |
| **Plaintiff,** | : | |
| | : | **No. 3:16-CV-2133 (VLB)** |
| **v.** | : | |
| | : | |
| **THOMAS & BETTS CORPORATION** | : | **December 20, 2018** |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |
| | : | |

## MEMORANDUM OF DECISION CONSTRUING CLAIMS

**I.    Introduction**

Before the Court are the parties' proposed constructions of the claims at issue in this patent infringement case filed by Wiremold Co. ("Wiremold" or "Plaintiff") against Thomas & Betts Corp. ("T&B," "Thomas & Betts," or "Defendant") alleging T&B infringed Wiremold's patents for in-floor electrical outlet boxes known as "poke-through fittings" – U.S. Patent No. 7,183,503 ("the '503 Patent") and U.S. Patent No. 8,063,317 ("the '317 Patent").  Plaintiff seeks declaratory judgment that Defendant infringes the '503 and '317 patents, an injunction against future infringement, money damages with interest, and attorney fees.  [Dkt. No. 55 (Am. Compl.) at 6-7].

The parties filed separate disputed claim terms charts on December 27, 2017. [Dkt. 73 (Plaintiff's Disputed Claim Terms Chart); Dkt. 74 (Defendant's Disputed Claim Terms Chart)].  The Court adopted Wiremold's submission as the operative

claim terms chart. [Dkt. 79]. The court held a *Markman* hearing on July 24, 2018 [Dkt. 89] and now construes the disputed claims.

II.     Background

    A.     *The Parties*

Plaintiff Wiremold manufactures "poke-through" fittings, which are "in-floor fitting[s] for providing access to an underfloor electric distribution system." [Dkt. 55-1, at 1]. These poke-through fittings are designed to be installed in an opening in a floor to provide access to an outlet below the floor. [Dkt. 82 (Defendant's *Markman* Brief), at 1]. The fittings typically include "intumescent material" which expands when heated to prevent fire from spreading out of the fitting. [*Id.*]. Plaintiff owns both the '317 Patent and the '503 Patent at issue in this case. [Dkt. 83 (Plaintiff's *Markman* Brief), at 1]. Like Plaintiff, Defendant holds "several U.S. patents directed to poke-through technology." [Dkt. 82, at 1]. One such patent is U. S. Patent Number 6,417,446 ("the '446 patent" or "Whitehead"). Plaintiff alleges that Defendant's products infringe on the '317 patent and the '503 patent.

    B.     *The Patents*

Both patents at issue pertain to in-floor electrical outlet boxes known as "poke-through fittings." The '503 Patent was the first, issued on February 27, 2007. [Dkt. 1, ¶ 6]. The inventors intended the '503 Patent to improve upon the drawback that prior art "protrude[d] above the surface of the floor." [Dkt. 82, at 6]. The specification of the patent describes "an in-floor fitting for providing access to an underfloor electric distribution system." [Dkt. 1-1 (the '503 Patent specification), at 2:3-5]. This system includes "a cover configured to move between open and closed

positions and being moved to an open position to allow a cable to pass through." [*Id.* at 2:5-8]. The fitting also includes "a receptacle positioned below the cover and configured to operatively connect to a cable comprising at least one of an electrical cable and a communication cable, wherein the cover was substantially flush with a surface of a floor when the cable is operatively connected to the receptacle and the cover is in the closed position." [*Id.* at 2:8-14]. Plaintiff alleges that the ability to plug in an electrical device while the fitting cover is closed improves upon the prior art. [Dkt. 83, at 4-5].

The '317 Patent was issued on November 22, 2011. [Dkt. 1, ¶ 7]. The specification for this patent describes "a recessed electrical outlet box for mounting in a floor" that includes "a body made at least partially of intumescent material and configured to retain at least one receptacle and a retention structure receiving the body. The retention structure is configured to retain the body within a hole in the floor and contain the expansion of the intumescent material." [Dkt. 1-2 (the '317 Patent specification), at 2:13-18]. Plaintiff alleges that the '317 Patent improves on prior art because it allows the body of the fitting to extend through and below the bottom of a concrete floor while retaining fire-retardant material. [Dkt. 83, at 10-11]. The focus of the '317 Patent differs slightly from that of the '503 patent, but the form and function of each patent is essentially the same – these are patents for fittings designed to allow a user to insert an electrical plug into a building floor while mitigating potential tripping and fire hazards.

### III.    Legal Standard

Resolution of a patent infringement case entails a two-step process, the first of which is claim construction, and the second of which is a comparison of the patented device or process to the accused device or process applying the terms as construed. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998), *abrogated on other grounds*; *Phil-Insul Corp. v. Airlite Plastics Co.*, No. 2016-1982, 2017 WL 1374696, at *10 (Fed. Cir. Apr. 17, 2017) (same). Only those terms that are in controversy need to be construed, and the construction only needs to be to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed. Cir. 1999). Claim construction, furthermore, is a question of law, and the Court has the exclusive power to construe "the meaning of the language used in the patent claim." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-79 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996); *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1321 (Fed. Cir. 2013). *In re Cuozzo Speed Techs, LLC*, 793 F.3d 1268, 1286 (Fed. Cir. 2015) (citing *Lighting Ballast Control LLC* for the principle that "[l]egal doctrine in patent law starts with the construction of the patent claims, for the claims measure the legal rights provided by the patent.").

If the Court is unable to determine whether a patent includes "one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention," the claims are "indefinite." *See* 35 U.S.C. § 112(b); *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014). A claim is indefinite when "its claims, read in light of the

specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc.*, 134 S. Ct. at 2124. Claims do not survive this standard merely because "a court can ascribe *some* meaning to a patent's claims," but rather when they would be understood by "a skilled artisan at the time of the patent application[.]" *Id.* at 2130.

The Court is to begin the claim construction analysis with intrinsic evidence. *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1299-300 (Fed. Cir. 2004). "Intrinsic evidence includes the claim language, the written description that precedes the claims in the patent specification, and, if in evidence, the prosecution history." *Chrisha Creations, Ltd. v. Dolgencorp, Inc.*, 817 F. Supp. 2d 363, 366 (S.D.N.Y. 2011) (citing *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1323 (Fed. Cir. 2001)). Procedurally, when constructing patent claims, "claim terms are given their ordinary and customary meaning, as they would be understood by one of ordinary skill in the art in question at the time of the invention." *3M Innovative Props. Co.*, 725 F.3d at 1321; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). A person of ordinary skill in the art "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Courts must first rely only on intrinsic evidence to resolve any claim term ambiguity, and it is impermissible to use extrinsic evidence to "contradict the established meaning of the claim language." *See DeMarini Sports*, 239 F.3d at 1323.

The Patent Act requires the specification to "contain a written description of the invention, and of the manner and process of making it and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is more nearly connected, to make and use the same." 35 U.S.C. § 112. A written description generally contains "an abstract of the invention, a description of the invention's background, a summary of the invention, patent drawings, and a detailed description that discusses preferred embodiments of the invention." *Chrisha Creations, Ltd.*, 817 F. Supp. 2d at 367; *see Dymo Costar Corp. v. Seiko Instruments USA, Inc.*, No. 3-00-cv-4 JHC, 2000 WL 502616, at *14 (D. Conn. Mar. 20, 2000) (listing "all parts of the specification" as "the sections detailing the background, summary, and preferred embodiment of the invention") (citing *Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352, 1356-57 (Fed. Cir. 1999)); *Lamoureux v. AnazaoHealth Corp.*, 669 F. Supp. 2d 227, 255 (D. Conn. 2009) (referring to background of the invention of the specification to determine appropriate claim construction).

"Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1314 (Fed. Cir. 2010) (quoting *Phillips*, 415 F.3d at 1314-15) (although claim construction is dependent on the language of the claims themselves, it requires reading that language "in view of the specification, of which they are a part"). "Idiosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification." *3M Innovative*

*Props. Co.*, 725 F.3d at 1321; *see also Thorner v. Sony Comp. Entm't Am. LLC*, 669 F.3d 1362, 1365–67 (Fed. Cir. 2012) ("The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history.").  The Court may refer to the "descriptive part of the specification" to determine the scope and meaning where the claims are based on the description.  *Phillips*, 415 F.3d at 1315.  The specification may be used to define terms even in the absence of an "explicit definitional format," as it may "define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *Trustees of Columbia Univ. in City of New York*, 811 F.3d 1359, 1364 (Fed. Cir. 2016).

"Claim terms are entitled to a 'heavy presumption' that they carry their ordinary and customary meaning to those skilled in the art in light of the claim term's usage in the patent specification."  *Elbex Video, Ltd. V. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed. Cir. 2007) (citing *SuperGuide Corp. v. DirecTV Enters. Inc.*, 358 F.3d 870, 874 (Fed. Cir. 2004); *Omega Eng'g, Inc., v. RayTec Corp.,* 334 F.3d 1314, 1323 (Fed. Cir. 2003)).  The only exceptions to this rule are "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."  *Thorner v. Sony Computer Entm't Am. LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012).  "Where claim language "is comprised of commonly used terms; each is used in common parlance and has no special meaning in the art," "the plain and ordinary meaning of the disputed claim language is clear" and need not be

construed.  *Summit 6, LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1291 (Fed. Cir. 2015).

Even though the specification informs the Court as to the use of the terms in the claims, "limitations discussed in the specification may not be read into the claims."  *3M Innovative Props. Co.*, 725 F.3d at 1321 (citing *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010)).  References to a preferred embodiment in a specification are not a claim limitation.  *Janssen Pharmaceutica N.V. v. Eon Labs Mfg., Inc.*, No. CV 01-2322 (NG) (MDG), 2003 WL 25819555, at *9 (E.D.N.Y. Nov. 26, 2003) (citing *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc)).  That being said, "the patentee's choice of preferred embodiments can shed light on the intended scope of the claims."  *Astrazaneca AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mut. Pharm. Co., Inc.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004).

Also, the preamble language is not to be interpreted to limit the scope of the claim when it "merely states the purpose or intended use of an invention."  *United Techs. Corp. v. PerkinElmer, Inc.*, 537 F. Supp. 2d 392, 397 (D. Conn. 2008) (citing *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006)).  The preamble may limit the claim, however, when the body of the claim "rel[ies] upon and derive[s] antecedent basis from the preamble" or if the drafter "chooses to use *both* the preamble and the body to define the subject matter of the claimed invention."  *United Techs. Corp*, 537 F. Supp. 2d at 397.  Determining whether the preamble is limiting must be based on "the facts of each case in light of the *claim as a whole and the invention described in the patent.*"  *Id.* (quoting *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003)).

Other claims from the patent may also be helpful to determine the meaning of a claim term, because in general claim terms are consistently used throughout the patent. *Phillips*, 415 F.3d at 1314. An example of this principle is where a dependent claim adds a limitation, because such a limitation creates the presumption that the limitation does not exist in the independent claim. *Id.* at 1314-15.

The prosecution history is another form of intrinsic evidence relevant to claim construction, particularly where a court must consider multiple patents in one family. Similar to the specification, prosecution history reflects a patentee's "attempt[ ] to explain and obtain the patent" and evidences how the PTO and inventor understood the patent. *Phillips*, 415 F.3d at 1317. "A statement made during prosecution of related patents may be properly considered in construing a term common to those patents, regardless of whether the statement pre- or post-dates the issuance of the particular patent at issue." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015). It is during prosecution history where an applicant may "define (lexicography), explain, or disavow claim scope during prosecution." *Id.* The prosecution history is particularly important because it may demonstrate "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317. Limitation statements made during prosecution are relevant to both later and earlier issued patents. *See Microsoft Corp.*, 357 F.3d at 1350 ("[W]e conclude that Multi–Tech's statements made during the prosecution of the #627 patent with regard to the scope of its inventions as disclosed in the

common specification are relevant not only to the #627 and the [later issued] #532 patents, but also to the earlier issued #649 patent."); *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation."). Once such limitations are in place, "an applicant cannot recapture claim scope that was surrendered or disclaimed." *Hakim*, 479 F.3d at 1317.

Only where the intrinsic evidence alone cannot resolve claim term ambiguity may the Court also rely on extrinsic evidence, "which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (citing *Markman*, 52 F.3d at 980) (internal quotation marks omitted). Extrinsic evidence, however, is less significant than intrinsic evidence when "determining the legally operative meaning of claim language. *Id.* (internal quotation marks omitted).

Dictionaries, general and technical alike, may be helpful because they "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. Where this is the case, "general purpose dictionaries may be helpful." *Id.*

IV.    <u>Analysis</u>

A.  <u>The "Substantially Flush" Term of the '503 Patent (Claim 1)</u>

The Court first turns to the disputed language of claim 1 of the '503 patent, which discloses an invention "wherein said cover is substantially flush with a surface of a floor when the cable is operatively connected to said receptacle and said cover is in said closed position."  [Dkt. 73-1 (Disputed Claim Terms Chart) at 1].  Plaintiff argues that the term "substantially flush" in Claim 1 is "comprised of common words used in common parlance without any special meaning in the art, and therefore the plain and ordinary meaning is clear."  [Dkt. 83, at 15].  Plaintiff contends that this construction is supported by the prosecution history of the patent and prior art.  [*Id.* at 15-16].

Defendant argues that the prosecution history of the '503 patent contradicts Plaintiff's proposed construction. Defendant asserts that the language should be construed to mean "no portion of the cover is raised above the surface of the floor when the cable is operatively connected to the receptacle and the cover is in the closed position; does not encompass a cover or door raised above the floor as shown in FIG. 2[.]"  [Dkt. 82, at 6].  Defendant supports this claim with evidence that during patent prosecution, Wiremold argued to the patent office that its invention was distinct from a prior invention because the previous patent showed doors that "are connected to a floor plate 146 that is mounted above the surface of the floor . . . thus, when the doors 150 are closed, they are not substantially flush with the surface of the floor 16, but are raised above the surface of the floor 16 with the floor plate 146." [Dkt. 85, at 3-4].  Furthermore,

Defendant relies on Plaintiff distinguishing Defendant's '446 patent by arguing that the cover/doors "were not "substantially flush" with the floor because those components were "raised above the surface of the floor." [Dkt. 82, at 9].

The Court construes the language "substantially flush" in accordance with its plain and ordinary meaning – the cover of the poke-through fitting is almost completely, but not fully, flush with the surface of the floor.  Defendant presents insufficient evidence to overcome the "heavy presumption" that this term carries its ordinary and customary meaning.  *SuperGuide Corp.,* 358 F.3d at 874. Defendant's construction would entirely negate the term "substantially" as it is used in the '503 patent, and Defendant presents no evidence that a person of ordinary skill in the art would have understood the limitation "substantially flush" to mean "no portion of the cover is raised above the surface of the floor."  [Dkt. 82, at 6].  The Oxford English Dictionary defines the adverb "substantially" as "[f]ully, amply, to a great extent or degree; considerably; significantly, much." Substantially definition, Oxford English Dictionary, 3rd Edition (2012).  Courts have previously construed the term "substantially" to claim an approximation. *See Cordis Corp. v. Medtronic AVE, Inc.,* 339 F.3d 1352, 1360 (Fed. Cir. 2003); *see also Liquid Dynamics Corp. v. Vaughn Co., Inc.,* 355 F.3d 1361, 1368 (Fed. Cir. 2004) ("The term 'substantial' is a meaningful modifier implying 'approximate' rather than 'perfect.'").

Defendant cites language in the specification stating that the '503 Patent teaches "a recessed in-floor fitting that *remains flush* with the floor even when receiving a cable plug."  [Dkt. 85, at 2 (quoting Dkt. 55-1, at 1:16-18)].  However,

this language must be read in light of the entire specification and the patent as a whole. The specification describes that the trim ring at the top of the fitting shall be mounted "slightly above, or flush with, the top surface of a floor." [Dkt. 1-1, at 3:67-4:1]. The specification also states that the fitting "does not include any components that protrude . . . substantially above the top surface of the floor." [*Id.* at 5:26-29]. Furthermore, the background of the invention indicates that "[c]omponents of many in-floor fittings upwardly protrude above the surface of the floor when electrical and communications devices within the fittings are operatively connected . . . Such protrusions may be aesthetically unpleasant and may also pose tripping hazards." [*Id.* at 1:56-64]. The '503 Patent clearly uses the words "substantially flush" to mean "sufficiently flush with the surface of the floor so as not to pose a tripping hazard," even when a cord is connected to the fitting.

Defendant relies chiefly on the prosecution history of the '503 Patent to support its construction, but Wiremold's statements during prosecution do not convince the Court that a person of ordinary skill in the art would read the '503 Patent in the manner Defendant proposes. The Court first notes that it does not accept Plaintiff's apparent contention that Wiremold's statements during patent prosecution are relevant only if they amount to a "clear and unmistakable disavowal" of claim meaning. [Dkt. 83, at 12, 13; Dkt. 89 (Hearing Transcript) 6:17-19 (Plaintiff's Counsel) ("There's only a dispute as to whether some portion of that plain and ordinary meaning was disavowed during the prosecution history.")]. Although courts look to prosecution history for clear statements

disavowing the ordinary meaning of a claim term, it is well settled law that courts also look to the prosecution history to inform how a person of ordinary skill in the art would have read the claim term. *See Aptalis Pharmatech, Inc. v. Apotex, Inc.,* 2018 WL 286123, at *5 (Fed. Cir. 2018)("[E]ven in the absence of a clear and unmistakable disavowal, we conclude that the prosecution history can be evaluated to determine how a person of ordinary skill would understand a given claim term."); *Fenner Invs., Ltd. V. Cellco Partnership,* 778 F.3d 1320, 1323 (Fed. Cir. 2015) ("Any explanation, elaboration, or qualification presented by the inventor during patent examination is relevant."). *See also Graham v. John Deere co.,* 383 U.S. 1, 33 (1966) ("[A]n invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office.").

The prosecution history supports Plaintiff's proposed construction.  Critical to understanding the meaning of Wiremold's statements and those of the patent examiner are the characteristics of the prior art referenced by the Patent Office. First, the patent examiner found a poke-through fitting manufactured by Drane, et. al. to disclose a cover that was "substantially flush" with the floor when the cover was slightly raised above the surface of the floor. [Dkt. 83-7, at 2].  This was in spite of language in the Drane specification describing the fitting as "flush." *See* [Dkt. 83-8, at 2:0035, 5:0058].  This indicates that the inventor of the '503 Patent did not understand it to disclose a cover that was not at all raised above the surface of the floor. Couched positively, the inventor of the '503 Patent understood the patent to disclose a cover that could be slightly above the surface

of the floor.  It further illustrates how the Patent Office interpreted the term "substantially flush."

Second, contrary to Defendant's assertions, Wiremold distinguished the '503 Patent from T&B's "Whitehead" patent not by contending that the Whitehead patent was raised above the surface of the floor while the '503 Patent was not, but rather that the Whitehead patent did not address whether the cover or door of the fitting would be substantially flush with the floor.  *See* [Dkt. 82, at 9] ("According to Wiremold, the cover/doors shown in FIG. 2 of the [Whitehead] Patent were not 'substantially flush' with the floor because those components were 'raised above the surface of the floor.") (internal citations omitted).  Although Wiremold's language, without context, suggests that Wiremold argued to the Patent Office that Whitehead did not disclose a cover that was "substantially flush," Wiremold's argument was that there was no claim in the Whitehead patent that the cover was substantially flush when a cable was connected to the fitting and the cover was closed.  Wiremold supported this argument by noting that Whitehead's picture showed doors that were raised above the surface of the floor.  Wiremold argued that the patent examiner had no basis to reject the '503 Patent because "Whitehead fails to disclose a cover or door that, when in a closed position, is substantially flush with the floor surface.  Rather, the doors 150 of Whitehead are connected to a floor plate 146 that is mounted above the surface of the floor 16."  [Dkt. 85-24, at 8-9].  The language "fails to disclose a cover or door that . . . is substantially flush" differs from the language "discloses a cover or door that is not substantially flush."  Through this statement, the

inventor was noting the fact that the '446 Patent did not address this limitation at all, not modifying the meaning of the term "substantially flush" in the '503 Patent.

Defendant asks the Court to examine the construction of the term "substantially vertical faces" in *Amhil Enterprises, Ltd. V. Wawa, Inc.*, 81 F.3d 1554 (Fed. Cir. 1996). This case is inapposite. In *Amhil Enterprises, Ltd.*, the court found that "the patentee used 'substantially vertical' and 'vertical' interchangeably," both in the specification and during patent prosecution, and that the patentee expressly distinguished its invention with prior art containing sloping, rather than vertical, faces. *Id.* at 1559-1562. In contrast, Wiremold uses the word "flush" without the modifier "substantially" only rarely in the specification and prosecution history, and the inventor did not concede in prosecution that the '503 Patent includes only embodiments in which no portion of the cover of the fitting lies above the surface of the floor. Accordingly, the Court adopts Wiremold's construction of claim 1 and construes "substantially flush" in accordance with its plain and ordinary meaning.

B. The "Sidewall" Language of the '317 Patent (Claims 55 and 61)

The court next examines the limitation from claims 55 and 61 of the '317 Patent. The parties dispute the length of the '317 Patent's sidewall, which surrounds the fitting in a hole in the floor in which the fitting is installed. Claim 55 recites: "a sidewall extending upwardly from the bottom wall between a bottom surface of the intumescent body and the bottom surface of the concrete." [Dkt. 83-2 ('317 patent), at 21:36-41]. Claim 61 recites: "the sidewall extending from at least a bottom surface of the intumescent body to the bottom surface of

the concrete floor." [Dkt. 83-2, at 22:20-26]. The Court construes these limitations together.

Wiremold proposes that the Court construe the sidewall limitation in accordance with plain and ordinary meaning as understood at the time of the invention. Alternatively, Wiremold asks the Court to construe the claims to mean "the sidewall extends upwardly from the bottom wall of the retention structure in or through the space separating a bottom surface of the intumescent insert to the bottom surface of the concrete, and [] the sidewall may extend beyond the bottom surface of the concrete." [Dkt. 83, at 24]; *See* [Dkt. 75-1, at 8-9].

Plaintiff argues that examining the specification shows that the sidewall "can extend upwardly into the hole in the floor to retain the intumescent body within the hole." [Dkt. 83, at 26]. The specification demonstrates an instance where the patentee used language to state that the sidewall "only extends from the bottom surface of the intumescent body to the bottom surface of the concrete floor." [*Id.* at 28]. Plaintiff argues that this shows that if the Patentee had wanted to adopt Thomas and Betts' construction of claim 55, he could have done so. [*Id.*]. Plaintiff further argues that "T&B's proposed construction would exclude almost every embodiment described in the '317 specification except for one "alternative" embodiment . . . There is no evidence to support such a construction, let alone "highly persuasive" evidence." [Dkt. 83, at 30].

Defendant proposes the court construe these claims to mean "the sidewall does not extend up into the hole in the concrete floor but only extends from the bottom surface of the intumescent body to the bottom surface of the concrete

floor." [Dkt. 82, at 18]. Claim 55 states that this "sidewall" extends "between a bottom surface of the intumescent body and the bottom surface of the concrete" [Dkt. 55-2 at 22:24-26] and claim 61 states that the "sidewall" extends "from at least a bottom surface of the intumescent body to the bottom surface of the concrete floor" [*Id.* at 22:24-26].

Defendant supports this argument with the proposition that claims should be construed in claim construction the same way they were construed to obtain their allowance in patent prosecution. *See Southwall*, 54 F.3d at 1570. Defendant notes that during prosecution of the application for the '317 patent, Wiremold "distinguished claims 55 and 61 from prior art by arguing that the disputed claim language reflected '[m]inimizing the overlap between the sidewall of the containment structure and the concrete hole', which was purportedly 'advantageous for reducing the thermal transfer of heat through the concrete hole.'" [Dkt. 82, at 20, citing Ex. D. at WRM000508-509; and WRM000545-57]. Defendant avers that "the plain meaning of this claim language is that the sidewall (of the retention structure) extends up from the bottom surface of the intumescent body to the bottom surface of the concrete floor, and no further (i.e., the sidewall does not extend up into the hole in the concrete floor)." [Dkt. 82, at 19].

In construing the claims, the court is "'constrained to follow the language of the claims and give the claim term its full breadth of ordinary meaning as understood by persons skilled in the art.'" *ACTV, Inc. v. Walt Disney Co.,* 346 F.3d 1082, 1091 (Fed. Cir. 2003). "In particular, 'where claims can [be] reasonably

interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent provocative evidence on the contrary.'" *GE Lighting Solutions, LLC v. AgiLight, Inc.,* 750 F.3d 1304, 1311 (Fed. Cir. 2014). Construction should be ruled out when it "reads out preferred embodiments and . . . is not supported by 'highly persuasive' evidence." *Epos Techs. Ltd. v. Pegasus Techs. Ltd.,* 766 F.3d 1338, 1347 (Fed. Cir. 2014).

Although dictionaries can be useful tools for constructing claims, the Court is wary of Plaintiff's heavy reliance on a dictionary definition for the word "between" in the discussion of claims 55 and 61. [Dkt. 83, at 25; Dkt. 89, at 83:5-17]. "Heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." *Phillips*, 415 F.3d at 1321. However, relying primarily on the intrinsic evidence – that is, the specification – the Court finds that the '317 Patent's sidewall need not terminate at the bottom surface of the concrete floor.

Language concerning the sidewall elsewhere in the specification supports Plaintiff's contention that these claims would not be read by an ordinary artisan to limit the extension of the sidewall to the bottom surface of the floor. First, claim 57 addresses the retention structure, of which the sidewall in claim 55 is a part, noting that the structure "comprises a generally circular base and an annular sidewall extending upwardly from said base." [Dkt. 83-2, at 22:4-7]. This discussion of the sidewall addresses a lower bound, but not an upper bound. Claim 63 contains identical language pertaining to claim 61. [Dkt. 83-2, at 22:30-

33]. Second, the description of the invention refers to the sidewall as creating a "cage" which surrounds the fitting. [Dkt. 83-2, at 5:44-47]. This language states "the height of the cage can be limited to only span the distance of the bottom of the body to the lower surface of the concrete floor instead of extending the entire height of the body." [Dkt. 83-2 ('317 Patent) at 6:24-28]. The use of the language "can be limited" illustrates that the specification contemplates that the sidewall of the retention structure may in some cases not be limited. Finally, claim 61 (but not claim 55) states that the sidewall of the retention structure extends from "at least a bottom surface of the intumescent body to the bottom surface of the concrete floor." [Dkt. 1-2, at 22:16-22:26]. The term "at least" indicates that the sidewall must cover, at a minimum, the distance between the bottom of the body and the lower surface of the concrete floor. Neither claim 55 nor claim 61 state that the sidewall extends "only" to the bottom of the concrete floor, or that the sidewall "terminates" at the bottom of the concrete floor. A person of ordinary skill in the art would not read these claims to indicate that the sidewall can extend no further than the bottom surface of the concrete floor.

Defendant's argument that Plaintiff noted during prosecution that "[m]inimizing the overlap between the sidewall of the containment structure and the concrete hole" actually bolsters Plaintiff's construction. *See* [Dkt. 85, at 18]. If there was no overlap between the containment structure and the concrete hole there would be no overlap to minimize. To "minimize" is "to reduce or keep to a minimum." *Minimize Definition*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/minimize. The fact that Plaintiff referenced "minimizing"

an overlap between the sidewall and the concrete hole contemplates that such an overlap would exist. Plaintiff did not claim during prosecution that the '317 Patent would "eliminate" this overlap.

For the foregoing reasons, the Court adopts the following construction for the disputed language in claims 55 and 61: "the sidewall extends upwardly from the bottom wall of the retention structure, extending fully through the space separating a bottom surface of the intumescent insert and the bottom surface of the concrete floor, terminating at or beyond the bottom surface of the concrete floor."

C. The "Operatively Connected" and "Being Moved To Said Closed Position" Language of the '503 Patent (claims 7, 8, and 20 of the '503 Patent)

Defendant argues that claims 7, 8, and 20 of the '503 Patent are indefinite under 35 U.S.C. § 112(b) because they contain language that does not refer to the device, but rather refers to actions taken by the user of the device. [Dkt. 82, at 11-14]. Defendant refers to language in 3 claims: 1) "operatively connected to said receptacle" in claim 7; 2) "being moved to said closed position" in claim 8; and 3) "then being moved to said closed position" in claim 20. *See* [Dkt. 73-1 (Disputed Claim Terms Chart) at 2-3].

A claim is indefinite when "its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc.*, 134 S. Ct. at 2124. "Definiteness is measured from the viewpoint of a person skilled in the art at the time the patent was filed." *Id.* at 2128. If a claim recites

both a system and a method of using that system, the claim is indefinite because it is "unclear whether infringement . . . occurs when one creates a[n infringing] system, or whether infringement occurs when the user actually uses [the system in an infringing manner." *MasterMine Software, Inc. v. Microsoft Corporation*, 874 F.3d 1307, 1316 (Fed. Cir. 2017) (alterations in original) (quoting *UltimatePointer, L. L. C. v. Nintendo Co., Ltd.*, 816 F.3d 816, 826 (Fed. Cir. 2016)).  However, where claims "merely use permissible functional language to describe the capabilities of the claimed system," they are not indefinite if they can "inform those skilled in the art about the scope of the invention with reasonable certainty[.]" *MasterMine*, 874 F.3d at 1316.

Courts analyzing whether claims address both an apparatus and a method of using the apparatus must "focus on whether the claim language is directed to user actions rather than system capabilities." *Bayer Pharma. A.G. v. Watson Labs., Inc.,* 2014 WL 4955617, at *6 (D. Del. Sept. 30, 2014).  Defendant relies on *IPXL Holdings, LLC v. Amazon.com, Inc.*, in which the Federal Circuit held that a patent claim that recites "both an apparatus and a method of using that apparatus" is indefinite.  *See* [Dkt. 82, at 12]; *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed Cir. 2005).  Plaintiff argues that the claims do not recite "method[s] of using the apparatus."

Plaintiff argues that the claims merely describe capabilities of the device, and that they are not indefinite because "[w]hile these claims make reference to user selection, they do not explicitly claim the user's act of selection, but rather, claim the system's capability to receive and respond to user selection." *See* [Dkt.

84, at 23] (*quoting Mastermine Software, Inc. v. Microsoft Corp.,* 874 F.3d 1307, at 1316 (Fed. Cir. 2017)).  Furthermore, Plaintiff requests that the Court defer ruling on this language until the close of discovery.  [Dkt. 83, at 36].

Claim 7 discloses the fitting identified in claim 1, "wherein a plug of an audio/video (AV) device is operatively connected to said receptacle and is positioned between said cover and said receptacle, and wherein said closed cover is configured to be substantially flush with said surface when said AV device is operatively connected to said receptacle." [Dkt. 83-1 ('503 Patent), at 6:37-39].  Claim 8 discloses the fitting identified in claim 1, "being moved to said closed position" while allowing an electrical cord to remain plugged into the fitting. [Dkt. 83-1, at 6:42-50].  Claim 20 discloses the fitting identified in claim 16, allowing for a cable to be plugged in while an access door is open, "then being moved to said closed position" such that a cable extends through an opening in the cover and the cover remains substantially flush with the upper surface of the floor.  [Dkt. 83-1, at 8:39-45].

The Court finds no reason to delay construction.  The disputed language in claims 7, 8, and 20 is directed to the invention's capabilities, not to user actions, thus constituting permissible "functional language" as described by the Federal Circuit.  *See Microprocessor Enhancement Corp. v. Tex. Instruments, Inc. (MEC)*, 520 F.3d 1367, 1375 (Fed. Cir. 2008); *accord MasterMine,* 874 F.3d at 1313.  The law requires that the patent describe the scope of invention with "reasonable certainty."  *Nautilus,* 134 S.Ct. at 2124.  Claims 7, 8 and 20 meet this standard. Defendant has provided no compelling reason to depart from the ordinary

meaning of these terms in construction.  An ordinary artisan would not read the language of Claims 8 and 20 as an attempt to disclose a method of opening and closing a cover, and the ordinary artisan certainly would not interpret the language of Claim 7 to disclose the act of plugging a cord into an electrical outlet.  Therefore, the Court construes these terms in accordance with their plain, ordinary, and customary meaning.

 D.  **The "Outlet Box" Language of the '317 Patent (Claims 4, 24, and 31)**

 The disputed language of claims 4, 24, and 31 concerns the use of the term "Outlet Box."  Claims 4 and 31 disclose a structure for the fitting which includes a base that "prevents the expansion of said intumescent material downward out of said outlet box or into the hole."  [Dkt. 83-1, at 18:13-16; 20:5-8].  Claim 24 discloses the same structure and base, which "prevents the expansion of said intumescent material downward out of said outlet box."  [Dkt. 83-2, at 19:32-35].

 Defendant argues that these claims are indefinite because they use language referring to an antecedent which is undefined.  Defendant alleges that the claims do not define the invention with reasonable certainty because they refer to "said outlet box" without previously defining the term "outlet box."  [Dkt. No. 82, at 16].  Plaintiff argues that that the patentee inadvertently failed to correct three instances of the word "outlet box" when amending the '317 Patent to refer to a "poke-through fitting" rather than a "recessed electrical outlet box."  [Dkt. 83, at 39].  Plaintiff asks the Court to correct this "obvious clerical error."  [Dkt. 83, at 41].

A claim can be indefinite "if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable." *Halliburton Energy Servs., Inc. v. M-I LLC,* 514 F.3d 1244, 1249 (Fed. Cir. 2008).  If the ambiguity in a claim stems from a clerical error, the district court may correct the error where "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims."  *Novo Industries., L.P. v. Micro Molds Corp.,* 350 f.3d 1348, 1357 (Fed. Cir. 2003).  Courts "may not redraft claims, whether to make them operable or to sustain their validity." *Chef Amer.,* 358 F.3d at 1374.  Judicial correction is only proper if it "does not require guesswork and is not a substantive correction to the claims."  *Image Processing Techs., LLC v. Samsung Elecs. Co.,* No. 2:16-CV-505, 2017 WL 2672616, at *31 (E.D. Tex. June 21, 2017).  Judicial correction is only applicable if the competing "interpretations would result in the same claim scope."  *CBT Flint Partners, LLC,* 654 F.3d at 1259 (Fed. Cir. 2011).

Although the parties devote significant briefing space to arguments for or against judicial correction of claims 4, 24, and 31, the Court need not decide whether the standard for correction is met because the language of the claims, read in light of the specification, already provides reasonable certainty as to the scope of the invention.  Therefore, the Court is able to construe the term "outlet box" without correcting the language of the patent.  The specification describes the invention as follows:

> FIG. 1 illustrates a top isometric view of a recessed in-floor fitting or outlet box positioned in a floor slab according to an embodiment of the present invention. By way of example only, the outlet box is a poke-through fitting. [Dkt. 83-2, at 4:19-22].

This language indicates that a poke through fitting is a type of outlet box. A person of ordinary skill in the art "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. A person of ordinary skill in the art, reading the claims in light of the entire specification, would understand that references to "said outlet box" immediately after "said poke-through fitting" refer to the poke-through fitting addressed in the relevant claim. Furthermore, the terms "outlet" and "box" are used in common parlance. Even absent the description's statement that the poke-through fitting is a type of outlet box, a person of ordinary skill would understand the antecedent basis for the term "said outlet box" to be the "poke-through fitting" disclosed in the claims referenced in claims 4, 24, and 31 and throughout the preamble and the specification.

The patent prosecution history does not contradict this construction. The Court finds no support for Defendant's argument that Plaintiff distinguished poke-through fittings from outlet boxes during prosecution. In its opposition claim construction brief, Defendant cites to the inventor's response to the patent examiner in 2010 which distinguishes the '317 Patent's poke-through fitting from a prior patent, known as "Dinh," which disclosed a "raceway fitting." *See* [Dkt. 85, at 23 (citing Dkt. 82-4, at 137-46)]. This interpretation of the statements is unpersuasive. It is clear that the inventor does not distinguish the '317 Patent

from Dinh on the grounds that Dinh discloses an "outlet box" and the '317 Patent discloses a "poke-through fitting." Instead, the inventor distinguishes a "poke-through" fitting from a "raceway fitting." Unlike poke-through fittings, which are installed by drilling a hole in a floor and installing the fitting in the hole, raceway fittings involve ductwork installed underneath the floor and connecting to outlets on the surface of the floor. [Dkt. 82-4, at 138]. The inventor refers to the Dinh patent as disclosing a "floor box," but does not use the term "outlet box" and does not distinguish outlet boxes from poke-through fittings. *See, e.g.,* [Dkt. 82-4, at 141].

The inventor modified the '317 Patent in a brief filed with the PTO in 2010. [Dkt. 83-22 (Response to Patent Office Action, February 18, 2010)]. The inventor states the reason for changing the term, which reason was to distinguish his poke-through fitting from a prior patent disclosing a raceway fitting. [*Id.* at 16]. To accomplish this goal, the inventor replaced references to a "recessed electrical outlet box" with references to a "poke-through fitting." *See* [Dkt. 82-4, at 125-31]. This language removes ambiguity that could cause conflict with the Dinh patent, as the meaning of the term "recessed electrical outlet box," interpreting these terms in accordance with their usage in common parlance, could also apply to Dinh's raceway fitting.

As defendant offers no alternative construction, the court construes these terms in accordance with their plain and ordinary meaning.

### E.  The "Into the Hole" Language of the '317 Patent (claims 4 and 31)

In addition to the challenge of indefiniteness due to the "outlet box" language of claims 4, 24, and 31, Defendant alleges that claims 4 and 31 are indefinite due to their disclosure of a retention structure including a base which prevents expansion of intumescent material "into the hole."  "Intumescent material" is a type of material that expands when heated, creating a seal in the poke-through fitting to prevent fire from spreading.  *See* [Dkt. 83-2, at 1:24-3:5].  Claims 4 and 31 read:

> The poke through fitting of claim [1 or 29], wherein said retention structure includes a base that prevents the expansion of said intumescent material downward out of said outlet box or into the hole.

[Dkt. 83-2, at 18:12-16, 20:5-9].

Defendant argues that Claims 4 and 31 are indefinite because they "recite that the claimed base 'prevents the expansion of said intumescent material . . . *into the hole.*'"  [Dkt. 82, at 17 (citing Dkt. 55-2 at 18:14-16, 20:6-8)].  Defendant alleges that this language cannot be squared with the remaining language of claims 1, 4, 29, and 31, which explains that the claimed 'poke through fitting' . . . is 'mount[ed] in [the] hole that extends through a concrete floor.'" [Dkt. 82, at 17].  Defendant states: "[i]f the intumescent material of the poke through fitting is already mounted *in the hole*, as required by independent claims 1 and [29], there is no possible way for a base to 'prevent[] the expansion of said intumescent material . . . *into the hole.*'" *Id.*  Plaintiff argues that nothing in the claim language prevents the poke through fitting from being mounted in the hole in a way that would make

it a "physical impossibility" for the base of the retention structure to prevent expansion of the intumescent material downward into the hole. [Dkt. 84, at 39].

Where inconsistent claim limitations render the claims "a physical impossibility," those claims are indefinite. *Tech. Innovations, LLC v. Amazon.com, Inc.,* 35 F.Supp.3d 613, 620-21 (D. Del. 2014). *See Virtual Solutions, LLC. V. Microsoft Corp.,* 925 F.Supp.2d 550, 574 (S.D.N.Y. 2013) (finding a claim indefinite when it "require[d] that two seeming-identical elements generate one output, without disclosing their relationship to persons having ordinary skill in the art.").

The Court agrees with Plaintiff. Nothing in these claims would lead a person of ordinary skill in the art to find an internal contradiction. The '317 Patent discloses a fitting that is installed in a hole, but nowhere does it recite that the fitting, including the retention structure, must fill the entire hole. In fact, the description of the invention identifies the possibility that there will be space in the hole below the fitting. The description states:

> If the in-floor fitting extends below the slab in which it is positioned, the intumescent material may expand downward and separate from the fitting and thus diminish the effectiveness of the intumescent material.

[Dkt. 83-2, 1:67-2:3]. This language *explicitly* contemplates that there may be some space below the fitting in the hole in which the fitting is mounted. Therefore, the claims are not indefinite, and the Court construes them in accordance with their plain and ordinary meaning.

## V.    Conclusion

The Court has considered the parties' arguments.  It is hereby ordered that the claim terms will be construed as follows:

A.    "**Wherein said cover is substantially flush with a surface of a floor when the cable is operatively connected to said receptacle and said cover is in said closed position**" is defined in accordance with its plain, ordinary, and customary meaning.

B.    "**A sidewall extending upwardly from the bottom wall between a bottom surface of the intumescent body and the bottom surface of the concrete**" in claims 55 and 61 of the '317 Patent means "the sidewall extends upwardly from the bottom wall of the retention structure, extending fully through the space separating a bottom surface of the intumescent insert and the bottom surface of the concrete floor, terminating at or beyond the bottom surface of the concrete floor."

C.    "**A plug of an audio/video (AV) device is operatively connected to said receptacle and is positioned between said cover and said receptacle**" is defined in accordance with its plain, ordinary, and customary meaning.

D.    "**Being moved to said closed position**" in claim 8 is defined in accordance with its plain, ordinary, and customary meaning.

E.    "**Then being moved to said closed position**" in claim 20 is defined in accordance with its plain, ordinary, and customary meaning.

F.  "<u>Said outlet box</u>" refers to the poke-through fitting identified earlier in the claims.

G.  "<u>Prevents the expansion of said intumescent material downward out of said outlet box or into the hole</u>" is defined in accordance with its plain, ordinary, and customary meaning.

H.  "<u>Prevents the expansion of said intumescent material downward out of said outlet box</u>" is defined in accordance with its plain, ordinary, and customary meaning.

The parties are ORDERED to meet and confer and propose an amended scheduling order for the remaining deadlines in the case in light of the progress of the case as discussed at the most recent status conference. *See* [Dkt. 91]. The parties shall file any proposed amendments to the Scheduling Order [Dkt. 67] and Amended Scheduling Order [Dkt. 81] within <u>thirty-five (35) days</u> of the date of this Order.

IT IS SO ORDERED

_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: December 20, 2018